(C. D. 1267)

JOHN V. CARR & SON, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided August 15, 1950)

*Tompkins & Tompkins*; *Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.*, of counsel), associate counsel; for the plaintiff.

*David N. Edelstein*, Assistant Attorney General (*Howard L. Harawitz* and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; MOLLISON, J., dissenting

COLE, Judge: Merchandise, invoiced as "SELENIUM DIOXIDE (COMMERCIAL GRADE)," was manufactured by Canadian Copper Refiners Limited of Montreal East, Quebec, and shipped by its selling agent, British Metals Corporation of Canada, Limited, Montreal, Canada, to the purchaser, Sharples Chemicals, Inc., of Wyandotte, Mich.

Plaintiff, as the purchaser's agent, entered the shipment at Detroit, where the material was classified as a chemical compound, not specially provided for, under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 5),[1] with duty assessment of 25 per centum ad valorem. Claim is made for free entry as a salt of selenium under paragraph 1758 of the Tariff Act of 1930 (19 U. S. C. § 1201, par. 1758).[2]

Plaintiff's admission that the product is in fact a chemical compound virtually eliminates from consideration the alternative claim for classification as a nonenumerated manufactured article under

---

[1] PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

[2] PAR. 1758. Selenium, and salts of.

paragraph 1558 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 1558), but whether or not the concession is abandonment of such claim, we find that the provisions of said paragraph have no application herein.

The issue is a narrow and very definite one, presenting for determination which of two paragraphs is controlling. Is it paragraph 5, *supra*, under which the merchandise was assessed, or paragraph 1758, *supra*, the principal claim advanced by plaintiff?

The record presents considerable proof of a chemical nature by well-qualified witnesses. Those who appeared on behalf of plaintiff have been active in the commercial production and development of selenium dioxide. Leslie Gillette, chief chemist in the plant of the importing corporation, manufacturer of synthetic organic chemicals, processed and analyzed the product under consideration which he characterized as a commercial grade of selenium dioxide. Dr. Charles L. Mantell, a consulting chemical engineer with 25 years' experience, worked with selenium and selenium compounds in the development of metallurgical processes and used selenium dioxide in commercial manufacturing operations. Dr. W. C. Fernelius, experienced as a consulting chemist, has become familiar with the development of selenium and selenium compounds, including selenium dioxide. John Henry Schloen, a metallurgist in the research and development department of the Canadian manufacturer and whose testimony was taken by deposition, plaintiff's collective exhibit G, worked on the method of producing the imported selenium dioxide during its development stage and also on the operation of commercial units.

Neither of defendant's witnesses dealt with selenium dioxide, commercially. Herbert W. Eckweiler, assistant chief chemist in the customs laboratory at New York, became familiar with selenium dioxide "as part of my education, training, reading, and we have had a number of samples of selenium dioxide for examination in the laboratory and they have been analyzed by the chemists working under my supervision." John E. Ricci, professor of chemistry at New York University, testified that he was familiar with the word "salt," "as a teacher," and that his production of selenium dioxide was in connection with experimental work in research, but never commercially.

Much of the testimony is highly technical and difficult for the lay mind to understand. Without individual references to each of the several witnesses, the entire record before us is summarized in this narrative form.

For a complete description of the procedure followed in acquiring the imported merchandise, we draw from the oral testimony of plaintiff's witness, said Dr. Charles L. Mantell, who observed production of selenium dioxide at the plant of the Canadian manufacturer, and

also from the proof obtained through the deposition, plaintiff's collective exhibit G, *supra*. The following explanation is supported by evidence from the two witnesses.

In the electrolytic refining of copper, crude selenium, a constituent of the metal, becomes part of the slime or sludge that drops to the bottom of the processing tank. The slime is dried and then treated with sulphuric acid, converting the metal values "into salts and those which are readily removable are taken away." The digested slimes are roasted at a temperature between 300 to 500 degrees Fahrenheit, and the selenium content is volatilized out as selenium dioxide and collected in fume towers. The material at that time is "associated with a large amount of other materials," and is then further processed "solely for purification, primarily for purification." Treatment with sulphur dioxide converts the substance into selenium that is subjected to two processes of distillation. The double distilled selenium, which is cast into flat cakes for cooking, is remelted in a retort heated to about 800 degrees Fahrenheit. Air is passed over the surface of the molten selenium, resulting in the formation of selenium vapor. To complete oxidation, the vapors are passed through a catalyst chamber, employing copper oxide, chromium oxide, or manganese oxide as a catalyst. The selenium dioxide vapor is condensed in solid form to produce the imported product, a commercial grade of selenium dioxide.

The chief use of selenium dioxide is as a source material from which selenium compounds are made. The importer of the present merchandise uses it to make selenium diethyl dithiocarbamate, a substance sold as "Selenac," and used as a rubber accelerator. Selenium dioxide also has some use as an oxidizing agent in organic chemistry and for the coloration of glass.

Plaintiff presents several reasons for seeking classification as a salt of selenium. It is argued that this selenium dioxide is a product resulting from the treatment of a metal with an acid, which is conceded by all the witnesses to be one way for forming a salt. The contention is based on the premise that the metal, selenium, is treated with sulphuric acid.

In disputing the claim, defendant points to testimony in the said deposition, wherein the witness limits the description of the manufacturing processes to the "vapor phase oxidation of Molten Selenium." To accept that statement as all-inclusive of the manufacturing operations, would mean to completely ignore the early stages of the processes through which the crude selenium is acquired and wholly disregard not only other competent oral testimony offered by plaintiff but also the contents of a booklet (identified as exhibit "A" in the deposition), titled "Canadian Copper Refiners Montreal East Plant," of which the witness is co-author, and that contains a thorough

description of the plant operations of the Canadian producer of this selenium dioxide.

The record in its entirety establishes that the imported product becomes available through treatment of selenium with sulphuric acid. It is true that the selenium dioxide obtained from the immediate process employing sulphuric acid is not the quality that was imported, but in the over-all manufacturing operations, which must be considered herein, sulphuric acid is a substantial element and essential in the series of processes bringing to its imported condition, selenium dioxide, commercial grade, the product under consideration.

Whether selenium is a metal, as claimed by plaintiff, is a matter of much controversy in the record before us. The witnesses for both parties are in disagreement and recognized chemical dictionaries and textbooks are not uniform on the subject. Dr. Fernelius aptly described selenium as a metalloid, i. e., a substance that has "some metallic properties and some non-metallic properties." The characterization is supported in additional testimony offered by plaintiff that selenium "has many metallic properties, and as far as its chemical activity can be considered, it is metal in character," that "it is also somewhat non-metallic in some of its other characteristics," and that treatment with acid activates its metallic properties. The booklet, said exhibit "A" in the deposition referred to, emphasizes the metal value of selenium in producing the present merchandise by explaining that the distilled selenium is collected in blocks that are allowed to cool slowly to obtain the gray metallic variety. The same publication contains several references to the metal, selenium.

The proof, showing that selenium is a metal, for the purposes of the present issue, is supported by authoritative reference books. The Encyclopaedia Britannica (14th Ed., Volume 20) contains the following:

> Crystalline Grey Selenium B (Metallic Selenium), formed by warming the other modifications to 200° C, has a metallic lustre, is malleable and, unlike variety A, is in certain circumstances a good electrical conductor. This metallic selenium (m. p. 220–2° C, sp. gr. 4.8) crystallises in rhombohedral crystals of the hexagonal system and is isomorphous with tellurium.

Kingzett's Chemical Encyclopaedia (7th Ed.), under the caption "Selenium (Se) and its Compounds" has this to say:

> Like sulphur it is allotropic, and the following forms are recognized: * * * (4) metallic gray selenium B, of sp. gr. 4.79, insoluble in carbon disulphide, produced when the other forms of selenium are maintained at 200° C., of metallic lustre, malleable, and a conductor of electricity in proportion to the light incident upon it.

We find, therefore, that the selenium dioxide, subject of this litigation, was produced by the treatment of the metal, selenium, with sulphuric acid, one of the ways for creating a salt.

Another accepted method (undisputed herein) for forming a salt is

by the reaction of a metal with a non-metal. The principle is applicable to the present merchandise through the process whereby air (admittedly a non-metal) is passed over molten selenium. The final step, leading to the imported selenium dioxide, is an additional process characteristic of the formation of salt.

Plaintiff makes the further contention that the selenium dioxide is classifiable under paragraph 1758, *supra*, by reason of its actions associated with the peculiarities of salt. In this connection, proof was introduced to show that the product is an electrolyte and an anhydride, the former being a substance that conducts current when dissolved in an aqueous solution), and the latter, a material which, when added to water, gives an acid. Each, in its application to selenium dioxide, gives significance to the imported product as a salt of selenium.

The witnesses for both sides agree that the combination of selenium dioxide with water creates an acid, i. e., selenious acid. The dispute between the parties lies in the cause of the conductive property. Plaintiff's witnesses stated the selenium dioxide actually conducts electricity and, therefore, is an electrolyte, a substance generally recognized as a salt. Defendant's witnesses testified to the effect that no electrolytic property is carried by selenium dioxide, *per se*, but conductivity of current is acquired in the solution of selenium dioxide and water that becomes selenious acid, conceded by all to be an electrolyte.

While the weight of the evidence supports plaintiff's proposition that selenium dioxide is in fact an electrolyte, a more convincing reason for the classification urged by plaintiff is found in the admission by all the witnesses that selenium dioxide is an anhydride and, particularly, an anhydride of selenious acid. The importance of this uncontradicted phase of the record is developed from plaintiff's testimony to the effect that it is common practice to refer to acids and their anhydrides synonymously, so that in common usage selenium dioxide and selenious acid are regarded as the same. Defendant's witness, Eckweiler, admitted to such usage in literature, scientific and otherwise, but he added that when it was done it was "carelessly so." That an anhydride is regarded as its corresponding acid, as substantial evidence herein shows, is supported by the common meaning of the term, defined in Funk & Wagnalls New Standard Dictionary (1941 edition) as follows:

anhydride 1. *Chem.* An oxid which becomes an acid when water is added, or *is regarded as an acid* from which the water has been removed, and which combines with basic oxids to form salts. [Italics added.]

The record, coupled with the definition just quoted, is sufficiently clear to say that the anhydride, selenium dioxide, can be accepted as selenious acid, which is concededly a salt of selenium. The finding

82

attaches the merchandise under consideration to the provisions of paragraph 1758, *supra*, within the broad interpretation applicable thereto.

Support for this statutory construction is found in the Summary of Tariff Information, 1920, prepared for use of the Committee on Ways and Means during its consideration of legislation ultimately enacted as the Tariff Act of 1922. The following excerpt therefrom is quoted both in defendant's brief and in plaintiff's reply brief:

SELENIUM AND SALTS OF SELENIUM.

**Description and uses.**—Selenium is an element with properties similar to sulphur and usually occurs in copper ores; production, therefore, is a by-product of the electrolytic refining of copper. It appears on the market as a black or red amorphous powder, and during 1918 sold for $2.75 to $3.75 per pound. Its chief use is as a decolorizer for glass and also, as a substitute for manganese compounds, in the manufacture of ruby glass. *The salts of selenium are the two acids, selenious* and selenic; the chloride, bromide and fluoride. None, however, is of commercial importance. [Italics added.]

The information set forth in the above quotation was before Congress when a provision for salts of selenium appeared in the Tariff Act of 1913 (paragraph 585). Enactment of the same provision, with no change in language, in the subsequent Tariff Act of 1922 (paragraph 1758) and the Tariff Act of 1930 (paragraph 1758) implies a Congressional intent to include in paragraph 1758, invoked herein by plaintiff, a broad field of selenium compounds, embracing, it is fair to say, the products specifically called to the attention of Congress at the time.

In applying paragraph 1758, *supra*, to the selenium dioxide in question, we give full force and effect to the broad and comprehensive language of said paragraph. The selection therein of the plural, "salts," without modifying or qualifying words, connotes a liberal use of the word, for if Congress intended to restrict the paragraph to some particular type or category it would have said so as it did in several paragraphs of the tariff act. For example, paragraph 21 is limited to chemical salts of gold, platinum, rhodium, and silver; paragraph 22 to chemical salts of bismuth; paragraph 88 to chemical salts of tin; and paragraph 91 to chemical salts of vanadium. The word "chemical" is not used in other paragraphs carrying provisions for salts. Paragraph 8 provides for antimony salts, paragraph 29 for cobalt salts, paragraph 50 for manganese salts, and paragraph 86 for strychnine salts.

The flexible application of the term "salts," as used in paragraph 1758, *supra*, is justified from convincing testimony in the record to the effect that "the term 'salt' has been broadened to include many materials which classically could not be judged by the chemist as a salt. This is particularly true in commerce."

At this point, it is appropriate to comment that to sustain the collector's classification would create the anomalous situation of having material used in manufacturing operations classifiable under a provision carrying a higher rate than the classification applicable to the finished product, a result not ordinarily accepted as consistent with the intent of Congress. *United States* v. *American Shipping Co.*, 13 Ct. Cust. Appls. 346, T. D. 41254. Our conclusion, avoiding the condition, is based on uncontradicted proof offered by plaintiff, hereinabove mentioned but repeated for emphasis.

One of the uses of the imported selenium dioxide is in the production of selenium diethyl dithiocarbamate, sold under the trade name "Selenac," and widely used as a rubber accelerator. The product is a salt of selenium and consequently free of duty under said paragraph 1758, the same as the source material, selenium dioxide, the substance discussed herein. In other words, the starting material and the finished product have equal tariff status.

The selenium dioxide in question is a salt of selenium, as contemplated by said paragraph 1758, and accordingly entitled to free entry thereunder, as claimed by plaintiff. Judgment will be rendered accordingly.

### DISSENTING OPINION

MOLLISON, Judge: I am unable to agree with the conclusion of my colleagues in this case. The evidence establishes that the article at bar is selenium dioxide, also known as selenious acid anhydride or selenious anhydride. It also establishes that selenium dioxide combines with water to form selenious acid.

From the evidence adduced during the trial and from the authorities cited, I am satisfied that the salts of selenium are formed from selenious and selenic acids. The merchandise at bar, therefore, is not itself a salt of selenium, but rather a material from which a salt of selenium may ultimately be formed.

In my view, therefore, the protest should be overruled.